**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4244**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RUSSELL CARRINGTON, a/k/a Rutt,

Defendant - Appellant.

**No. 15-4349**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MICHELLE MCNAIR,

Defendant - Appellant.

**No. 15-4400**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEPH YOUNG, a/k/a Monster,

Defendant - Appellant.

---

**No. 15-4482**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ASHLEY NEWTON,

Defendant - Appellant.

---

**No. 15-4605**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TRAVIS PAYLOR,

Defendant - Appellant.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge.  (1:13-cr-00151-ELH-27; 1:13-cr-00151-ELH-37; 1:13-cr-00151-ELH-25; 1:13-cr-00151-ELH-39; 1:13-cr-00151-ELH-40)

---

Argued:  March 24, 2017                                    Decided:  July 25, 2017

---

Before FLOYD and HARRIS, Circuit Judges, and John Preston BAILEY, United States District Judge for the Northern District of West Virginia, sitting by designation.

---

Nos. 15-4244, 15-4349, 15-4482 and 15-4605 affirmed; No. 15-4400 affirmed in part, vacated in part, and remanded by unpublished opinion.  Judge Harris wrote the opinion, in which Judge Floyd and Judge Bailey joined.

---

**ARGUED:**  Richard Bruce Bardos, SCHULMAN, HERSHFIELD & GILDEN, P.A., Baltimore, Maryland, for Appellants.  Robert Reeves Harding, Ayn Brigoli Ducao, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:**  Michael D. Montemarano, MICHAEL D. MONTEMARANO, PA, Columbia, Maryland, for Appellant Paylor.  Anthony D. Martin, ANTHONY D. MARTIN, PC, Greenbelt, Maryland, for Appellant Carrington.  Carmen D. Hernandez, LAW OFFICES OF CARMEN D. HERNANDEZ, Highland, Maryland, for Appellant McNair.  Jonathan A. Gladstone, Annapolis, Maryland, for Appellant Newton.  Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

For a number of years, the Black Guerilla Family ("BGF"), a prison and street gang, ran a criminal enterprise inside the Baltimore City Detention Center. With the help of complicit correctional officers and other Detention Center employees, BGF inmates were able to smuggle narcotics, cell phones, and other contraband into the facility, and to use their dominant position to control other inmates and to support gang members on the outside. Ultimately, a grand jury indicted a group of BGF members and Detention Center employees on charges including racketeering conspiracy, narcotics distribution, and money laundering conspiracy. Eight of the charged defendants went to trial, and after a twenty-day trial and four days of jury deliberation, five defendants – two BGF members and three Detention Center employees – were convicted.

The five appellants now challenge their convictions, focusing primarily on the district court's jury instructions. Two appellants also challenge their sentences. For the reasons that follow, we affirm all of the appellants' convictions, but vacate the sentence of one appellant, Joseph Young, and remand to the district court for resentencing.

## I.

### A.

From 2007 through 2013, the Baltimore City Detention Center was home to a sprawling criminal enterprise led by the Black Guerilla Family. BGF members, correctional officers, and other jail employees all played central roles in the enterprise. BGF members bribed correctional officers to smuggle into the facility contraband

4

supplied by gang members on the outside, including drugs, tobacco, and cell phones. Detention Center employees also facilitated attacks on inmates targeted by BGF, and helped BGF to conceal its gang activities. And BGF used its position within the Detention Center to assist gang members outside the jail, financially supporting BGF with profits from narcotics trafficking and coordinating outside criminal activity. In exchange for their cooperation in this extensive BGF enterprise, Detention Facility employees were paid with "Green Dot MoneyPak" cards, prepaid debit cards available at retail stores. J.A. 213.

The five appellants in this case played various parts in BGF's operations. Appellants Joseph Young and Russell Carrington were inmates and members of BGF: Young, a high-ranking BGF member, sold controlled substances in the jail, and Carrington recruited correctional officers to smuggle contraband and to set up drug sales. Appellants Travis Paylor, Ashley Newton, and Michelle McNair all were employees of BCDC. Paylor and Newton were correctional officers who smuggled contraband into the facility, while McNair was a contract kitchen worker who delivered contraband to BGF members.

Count one of the indictment against the appellants – the count most directly at issue in this appeal – charged the appellants and other defendants with racketeering conspiracy. Specifically, the indictment alleged a conspiracy to participate in the affairs of the BGF enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Six predicate racketeering offenses were listed as "A-F" in the "Racketeering Violation"

5

section of the indictment: conspiracy to distribute a controlled substance, distribution and possession with intent to distribute a controlled substance, bribery of a public employee under Maryland law, extortion under Maryland law, money laundering, and retaliation against a witness. J.A. 175–76. And in an embellishment that would prove central to this case, the indictment also detailed 161 "Overt Acts," describing the specific activities through which BGF operations allegedly had been conducted. J.A. 185.

The appellants and three co-defendants proceeded to trial on November 17, 2014. Cooperating defendants – members of BGF and correctional officers who previously had pleaded guilty – testified at trial regarding BGF's drug-dealing operations and use of violence to control the jail, and the role played by correctional officers in smuggling narcotics, cell phones, and other contraband to BGF inmates. Several witnesses testified directly to McNair's use of her job as a kitchen worker to deliver contraband to prisoners. Witnesses also testified to the participation of Carrington and Young as BGF members, and to the smuggling activities of correctional officers Paylor and Newton.

**B.**

Because the appellants' principal challenge to their convictions concerns the district court's jury instructions on the RICO conspiracy charge, we describe those instructions and the events surrounding them in some detail. As noted above, the indictment properly listed six "A-F" predicate racketeering offenses, any two of which would support a RICO conspiracy conviction. It also listed, however, 161 "overt acts," and the relationship between those two lists – racketeering offenses and overt acts – would end up generating significant confusion at trial.

6

On January 27, 2015, the district court gave its initial jury instructions on the RICO conspiracy charge. The court explained, correctly, that the government was required to prove a conspiracy that "involved the commission of two racketeering acts," and properly identified the alleged "pattern of racketeering activity" as the six criminal offenses marked as "A-F" in the indictment. J.A. 2047. But the court also instructed the jury, this time incorrectly, that the "government must prove that at least two of the *overt acts* alleged in Count One were or were intended to be committed as part of the conspiracy." *Id.* (emphasis added).

The district court addressed the jury again the next day, reviewing the verdict form as it pertained to the RICO conspiracy charge. The form, the judge explained, asked first whether the jury had "unanimously agreed" that certain "racketeering acts named in Count One were or were intended to be committed as part of the conspiracy." J.A. 2223. But instead of stopping there, the court went on to suggest that "racketeering acts" and "overt acts" were the same thing: "There's a terminology issue. They're called overt acts in the indictment . . . . I prefer to call them racketeering acts . . . . But if you do find . . . any racketeering acts or overt acts, as they're called in the indictment, list them on that line . . . ." *Id.* The district court finished charging the jury, and the jurors began their deliberations.

It became apparent almost immediately that the jury was confused. On the following morning, and about an hour and a half into deliberations, the jury sent a note seeking clarification: "For completion of the Jury Verdict Form, please clarify what is meant by 'racketeering acts' found under Count One: Are they A-F found on page 19 of

the Instructions? [O]r [a]re they the 161 Overt Acts listed in the Indictment?" J.A. 2362. A bench conference followed, in which the court initially stated its belief that the six statutory A-F offenses were the relevant "racketeering acts." But the government disagreed, arguing that it was the overt acts that were critical, and suggesting that the jury be directed to "pick two of the[ ] things listed in A through F, at least two, and also two, at least two[,] of the 161 overt acts[.]" J.A. 2240. The court adopted the government's suggestion. It first instructed the jury that it should "find racketeering acts listed [as A-F]. . . . That is it." J.A. 2248. But "[o]ut of caution," it added, the jury also should "find that at least two of the overt acts were committed as well." *Id.*

And there things stood until the afternoon of the same day, January 29, 2015, when the government changed its position, as reflected in a letter sent by the lead prosecutor to the district court. It would be sufficient, the government now concluded, for the jury to identify at least two of the predicate racketeering offenses listed as A through F in the indictment, without the need for findings as to overt acts. The government also urged reinstruction of the jury to make clear – as the defense had argued – that the "jury should be unanimous as to which types of racketeering activity the defendant agreed would be committed." J.A. 2282.

At a hearing the next day, the district court ruled, with the agreement of all parties, that it would reinstruct the jury using instructions proposed by the defense and consistent with the government's revised position. Again with the parties' agreement, the court also decided to modify the jury verdict form, making clear that the jury was required to indicate which particular racketeering activities it unanimously found in connection with

8

each defendant. The district court denied motions to dismiss the indictment and for a mistrial filed by the defendants, based on the original instructions. It did, however, offer each defendant time to make supplemental closing remarks to address the new jury instructions and any prior misstatements about overt acts. The defendants declined the opportunity for additional argument.

Finally, on February 2, 2014, the court reinstructed the jury on the RICO conspiracy count. There is no dispute as to the correctness of those instructions: The district court explained that in order to convict a defendant, the jury must agree unanimously on two or more of the six predicate racketeering offenses listed in the indictment, and then read those racketeering offenses verbatim from the list at A through F. This time, there was no mention of overt acts, though the court did clarify that "other conduct, whether or not criminal or illegal in nature, cannot be racketeering acts as they are defined under the law." J.A. 2320. The court also carefully walked the jury through the revised verdict form, which, as to each defendant, listed the six "A-F" racketeering offenses and asked the jury to mark with an "x" each type of racketeering activity "unanimously found to be part of the pattern of racketeering in the conspiracy that the defendant . . . joined." J.A. 2322. And finally, the court emphasized that because the original instructions had been incorrect, the jury was required to disregard both the instructions themselves and any argument by the parties based on those instructions, and to discard its prior deliberations and begin anew.

After this final instruction, the jury deliberated for three days before finding the five appellants guilty on the RICO conspiracy charge, along with other charges.

9

Consistent with the jury instructions, as to each defendant, the jury indicated on the verdict sheet which racketeering acts it unanimously agreed were applicable. For Paylor, the jurors marked the two narcotics offenses: conspiracy to distribute a controlled substance, and distribution and possession with intent to distribute a controlled substance. For Carrington, the jurors marked the two narcotics offenses and bribery; for Newton and McNair, the two narcotics offenses and money laundering. Finally, for Young, the jurors marked five of the six racketeering acts, all but retaliating against a witness.

## II.

The appellants raise several arguments on appeal, some jointly and some individually. We begin with the primary issue in this case: the appellants' joint claim that the district court's initial jury instructions were incorrect, entitling them to a new trial. We then address the appellants' individual claims regarding their convictions and, finally, the challenges brought by two of the appellants to their sentences.

## A.

We begin with the appellants' claim that the district court's original jury instructions on the RICO conspiracy claim improperly expanded the definition of predicate racketeering acts to include the 161 overt acts charged in the indictment. The result, the appellants argue, was a confused jury and a tainted jury verdict, necessitating a new trial. We disagree.

Because this issue rests on an understanding of the elements of RICO conspiracy, we begin with a brief explanation of the statutory framework. RICO makes it unlawful to

10

"conduct or participate, directly or indirectly, in the conduct of [a covered] enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). A "pattern of racketeering activity" – the critical element here – is defined as "at least two acts of racketeering activity" occurring within a ten-year period. *Id.* § 1961(5). And "racketeering activity" – often referred to as predicate acts or offenses – is statutorily defined to include "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance . . . chargeable under state law and punishable by imprisonment for more than one year." *Id.* § 1961(1)(A). The offenses listed at A through F of the indictment in this case fall within the category of predicate racketeering acts.

The appellants here were convicted under 18 U.S.C. § 1962(d), which prohibits conspiracy to commit the substantive RICO offense outlined above. Tracking those requirements, a conviction for conspiracy under § 1962(d) requires the government to prove "that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012) (internal quotation marks and citation omitted). But – and critically for this case – unlike the general conspiracy provision applicable to federal crimes, 18 U.S.C. § 371, the RICO conspiracy provision does not require proof of any overt acts committed in furtherance of the conspiracy. *Salinas v. United States*, 522 U.S. 52, 63 (1997). To convict for RICO conspiracy under § 1962(d), it is necessary and also sufficient that the jury unanimously find that a defendant has

11

agreed to the commission of at least two predicate racketeering acts; no finding as to overt acts is required. *See United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015).

The gist of the appellants' claim is that the district court's initial instructions to the jury improperly conflated predicate "racketeering acts" – those listed at A-F of the indictment – with the 161 "overt acts" also listed in the indictment. As a result, the appellants argue, the jury would have believed that it could convict under § 1962(d) based on a finding of two or more of the listed "overt acts," most of which fail to qualify as racketeering activity and many of which are not illegal at all – and without the necessary finding of at least two predicate A-F racketeering acts.

We may assume for the sake of argument that the court's original instructions, provided on January 27 and 28, 2015, could have given rise to the confusion that concerns the appellants. But the problem for the appellants is everything that happened next. After deliberating for a short period of time, the jury signaled that it had questions. And while the court's response did not resolve fully the role of "overt acts," it did address the appellants' underlying concern, making clear that the jury was required, at a minimum, to find at least two of the predicate racketeering acts listed at A through F of the indictment. And finally, there is no dispute that in the end the jury was instructed entirely correctly, directed to agree unanimously on two or more of six predicate racketeering acts specified by the court itself, and cautioned that no other illegal conduct would qualify as the necessary racketeering activity.

For that reason, the appellants are not entitled to relief on the ground that the district court failed to give proper jury instructions. As the appellants acknowledge in

12

their brief, the threshold premise of such a claim is that the district court in fact failed to instruct the jury correctly. *See* Consol. Br. of Appellants at 18; *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995) (improper jury instructions constitute reversible error only where, *inter alia*, a district court has refused to give an instruction requested by the defense that is correct and that is not substantially covered by the charge actually given the jury). That may seem like a tautology, but here it is dispositive: There is no question – and the appellants do not argue otherwise – that the district court ultimately *did* instruct the jury properly on the elements of RICO conspiracy and, in particular, on the definition of "racketeering activity" at the heart of this appeal.

The appellants insist, however, that the initial instructions offered by the court in this case were so prejudicial that they tainted the resulting verdict and rendered their trial fundamentally unfair. We cannot agree. First, it should be noted that most of the confusion reflected by the evolving jury instructions was not, as the appellants would have it, over whether a finding of two or more racketeering acts was *necessary* to a RICO conspiracy conviction; it was over whether such a finding was *sufficient*, or, alternatively, whether the jury also must find two or more overt acts. From the start, that is, the court instructed the jury, consistent with the appellants' position, on the need to find an agreement to commit at least two of the racketeering acts listed at A-F in the indictment. The controversy was over a different point, with the government initially persuading the court of the need for an *additional* finding as to at least two of the 161 overt acts listed in the indictment. And while the government and the court later corrected themselves, the

13

primary effect of that initial error was to heighten, not to reduce, the burden of proof imposed on the government.

In any event, the court in fact did correct itself. And in addition to providing proper instructions on the RICO conspiracy count, the court carefully advised the jury to give no effect to its prior instructions, nor to any argument by the parties based on its instructions. It also made clear that the jury would have to "discard[]" its prior deliberations and start again, basing new deliberations on the corrected instructions given on February 2, 2015. J.A. 2312. We may presume that the jury followed those instructions, *see United States v. Moye*, 454 F.3d 390, 399 (4th Cir. 2006), and that any confusion generated by the court's earlier instructions had no effect on the jury's subsequent deliberations.

Indeed, we know that to be the case here because the jury showed its work. The revised verdict form returned by the jury makes clear beyond dispute that as to each convicted defendant, the jury found (and marked with an "x") at least two of the qualifying predicate racketeering offenses originally listed at A through F of the indictment. There is nothing to suggest that the jury was confused, or ticked through this task by rote. A different combination of racketeering activities was marked for each of the five convicted defendants, reflecting the particular evidence introduced against each at trial; and a form reflecting that there had been no agreement to engage in any of the listed racketeering activities was returned for the three defendants who were acquitted. As the appellants themselves conceded at oral argument, "there is no question" that the

14

jury ultimately found that each convicted defendant had committed qualifying racketeering acts.

Nor is there anything that raises concerns about the fundamental fairness of the proceedings. When the district court decided to reinstruct the jury, it gave each of the appellants the opportunity to present supplemental closing arguments addressing this issue. Had the appellants harbored misgivings about the final instructions or their effect on the jury, they could have used this opportunity to address them, rather than declining the district court's offer. And we note that the jury had deliberated only for a short time before this issue surfaced, and then, after the final and corrected instructions were given, deliberated for a full three days before returning a verdict. There is no inference from the timing, in other words, that the jury's conclusion was based on its truncated deliberations before the reinstruction, rather than its extended deliberations after.

In sum, in light of the final and correct instructions given by the district court, together with the revised verdict forms and the court's other curative efforts, we conclude that the appellants are not entitled to a new trial as a result of the court's initial instructions.[1]

**B.**

---

[1] To the extent the appellants attempt to bootstrap onto a standard jury instruction argument a claim of prosecutorial misconduct, we reject that effort. Though the government, as it concedes, was mistaken in its initial view that the jury was required to find overt acts as well as predicate racketeering activity – an error, again, that did nothing to assist the government – it corrected that error on its own initiative through its letter to the district court, and consented to all of the district court's efforts to rectify the error. The appellants' suggestion of deliberate prosecutorial misconduct is without merit.

We next address Travis Paylor's claim that the district court erred in denying his suppression motion and admitting certain text messages from his cell phone at trial. The FBI agents who searched Paylor's phone for messages did so pursuant to a search warrant. But because that warrant expired before the messages were recovered, Paylor argues, the search was effectively warrantless and therefore violated the Fourth Amendment. For the reasons given below, we hold that Paylor is not entitled to relief on this claim.

On April 4, 2014, the FBI obtained a warrant authorizing the search of over 80 electronic devices that had been lawfully seized during its BCDC investigation, including two iPhones recovered from Paylor's residence. The warrant expired fourteen days later, on April 18, 2014. It was not until October 2014, however, that the FBI completed its forensic analysis, in part because one of Paylor's phones – the one from which the relevant texts were obtained – was damaged and had to be sent to a special FBI unit for examination. Ultimately, the FBI recovered a series of text messages referring to drug smuggling activity and using the distinct terminology of the BGF gang and its BCDC enterprise. A 33-page print out of selected text messages was admitted at trial.

As the Supreme Court has held and neither party disputes, the government generally may not search a cell phone without a valid search warrant. *See Riley v. California*, 134 S. Ct. 2473, 2485 (2014). Paylor argues that the government violated this principle when it searched his cell phone because, although the FBI had obtained a warrant, that warrant had expired, rendering it effectively void. And there is some support for this approach in our decision in *Yanez-Marquez v. Lynch*, 789 F.3d 434 (4th

16

Cir. 2015), treating a search of a home at night pursuant to a search warrant that authorized only daytime searches as effectively warrantless and therefore unconstitutional. *Id.* at 466–68. *But see id.* at 467 n. 20 (noting and distinguishing cases in which search warrants are executed after expiration dates).

The problem with Paylor's argument, however, is its premise: that his phone was not "searched" for Fourth Amendment purposes until the FBI completed its forensic analysis of the phone in October of 2014. Rule 41 of the Federal Rules of Criminal Procedure, governing search and seizure, includes a specific provision for warrants seeking electronically stored information, like the search warrant in this case. Fed. R. Crim. P. 41(e)(2)(B). Such warrants, Rule 41(e)(2)(B) makes clear, are deemed executed when the electronically stored information is seized and brought within the government's control, rather than when the information is analyzed by the government. *Id.* ("The time for executing the warrant . . . refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review."). In other words, an initial seizure of Paylor's phone after the 14-day expiration period would have contravened the terms of the warrant – but that is not what happened here, where the phone already was in government custody pursuant to a lawful seizure. And the fact that the government did not "review" the texts on the phone until after the warrant's expiration date is consistent with the warrant itself. *See id.* ("Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."); *United States v. Huart*, 735 F.3d 972, 974 n.2 (7th Cir. 2013) ("[U]nder [Rule] 41(e)(2)(B), a warrant for electronically stored information is executed when the information is seized or copied –

17

here, when the [government] seized the phone.  Law enforcement is permitted to decode or otherwise analyze data on a seized device at a later time.").

In any event, we agree with the government that even if the district court had erred in denying Paylor's suppression motion, any such error would have been harmless.  *See United States v. Abu Ali*, 528 F.3d 210, 256 (4th Cir. 2008) (constitutional error does not require reversal where error is "harmless beyond a reasonable doubt" (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986))).  The trial evidence against Paylor was exceptionally strong.  Several witnesses testified that Paylor worked with other correctional officers to smuggle narcotics into BCDC and distributed narcotics to inmates.  And the search of Paylor's home turned up not only the cell phones at issue, but also a written record of an inmate payment to Paylor; drug paraphernalia; and the MoneyPaks with which BGF compensated cooperating correctional officers, as well as MoneyPak receipts.

Accordingly, we conclude that Paylor cannot prevail on his Fourth Amendment claim.  And while Paylor also objects to certain evidentiary rulings related to the admission of his text messages, we have reviewed the record and find no error in those rulings.  We thus have no ground to disturb Paylor's conviction.[2]

---

[2] Two other appellants also bring various challenges to their convictions. Carrington argues that he is entitled to a mistrial for three reasons:  The district court improperly allowed the jury to hear evidence of a prior arrest (though the court subsequently ordered the testimony stricken and gave a curative instruction); there was insufficient evidence to support the jury's finding that he engaged in the predicate racketeering offense of bribery under Maryland law (though the jury also found two other predicate racketeering offenses, sufficient to sustain a RICO conspiracy conviction); and (Continued)

## C.

Paylor also challenges his sentence, as does Joseph Young. Both argue that the district court failed to resolve disputed factual matters related to their sentences. As to Paylor, we disagree. But as to Young, we agree that the district court did not make adequate factual findings, and therefore remand for resentencing.

We begin with Paylor. Paylor's Presentence Report ("PSR") was filed in March of 2015. Adopting the government's position as to the quantity of drugs attributable to Paylor, the PSR set the initial offense level at 24. The PSR also applied a pair of two-level upward adjustments, one for distribution of a controlled substance in a correctional facility and one for abuse of a position of trust. Based on those findings, Paylor's total offense level was 28 and his Guidelines range was 78 to 97 months' imprisonment. Paylor filed a sentencing memorandum, opposed by the government, disputing both the quantity of drugs attributed to him for purposes of setting his offense level and the two-level enhancement for abuse of trust.

The district court adopted "the factual findings and advisory guideline application in the [PSR] without change." J.A. 2771. Based on those Guidelines calculations and an analysis of the factors set out in 18 U.S.C. § 3553(a), the district court sentenced Paylor to 76 months in prison, two months below the Guidelines range. As noted above, Paylor

---

the district court erred in admitting certain co-conspirator testimony. McNair takes issue with statements made by the prosecutor in closing argument, alleging that they were factually or legally inaccurate. We have reviewed the relevant record and considered each of these arguments, and find the claims to be without merit.

claims that in imposing this sentence, the district court impermissibly failed to resolve the factual disputes he had raised.

The general principles that govern this issue are not contested. When a defendant raises factual disputes bearing on matters that affect sentencing, a district court is obligated to resolve those disputes. Fed. R. Crim. P. 32(i)(3)(B); *see United States v. Flores-Alvarado*, 779 F.3d 250, 256 (4th Cir. 2015) (applying Rule 32(i)(3)(B) to dispute over attribution of drug quantities). It is the sentencing court's "findings on controverted matters" that "ensure a record as to how the district court ruled on any alleged inaccuracy in the PSR" and allow for "effective appellate review of the sentence imposed." *United States v. Bolden*, 325 F.3d 471, 497 (4th Cir. 2003) (internal quotation marks and citation omitted).

But, critically, a district court's adoption of the PSR "can be a satisfactory means of resolving factual disputes" as required by Rule 32(i)(3)(B). *Flores-Alvarado*, 779 F.3d at 256. That will not be the case where the PSR itself falls short of supporting a recommended offense level or enhancement – where, for instance, a PSR's factual recitations are insufficient to justify its determination on a contested question. *Id.*; *see also Bolden*, 325 F.3d at 498. Paylor does not argue, however, that his PSR, which made specific recommendations as to drug quantity and application of the abuse of trust enhancement, did not include the findings necessary to support those recommendations, and our review likewise shows no such failure. We therefore agree with the government that by adopting the factual findings of the PSR, the district court satisfied its obligation to resolve the factual disputes raised by Paylor.

20

Young's PSR, however, is different in one crucial respect. Filed in May of 2015 along with an addendum containing Young's objections, the PSR set an initial offense level of 26, based on the quantity of drugs attributed to Young. The total offense level was calculated at 32, in part because of a four-level upward adjustment for role in the offense, deeming Young an "organizer or leader" of criminal activity. J.A. 2659. But unlike Paylor's PSR, Young's PSR recognizes that Young had raised factual disputes regarding both "the drug amount attributed to the defendant and the defendant's role within the conspiracy," and expressly declines to resolve those disputes, instead "defer[ring] to the Court for resolution[.]" J.A. 2660.

As with Paylor, however, the district court simply adopted the findings of the PSR, except that it imposed a two-level increase for role rather than the recommended four-level increase. With a Guidelines range of 151 to 188 months' imprisonment, the district court imposed a sentence of 180 months.

We must agree with Young that the district court failed to resolve the factual disputes he raised regarding his Guidelines calculation. At no point during the sentencing hearing did the court address Young's factual objections to the drug quantity or offense role on which his Guidelines range was based. Nor did the court indicate that resolution was unnecessary because neither issue would affect its sentencing decision. *See* Fed. R. Crim. P. 32(i)(3)(B) (allowing court, instead of ruling on dispute, to make determination that ruling is unnecessary because disputed matter will not affect sentencing). Instead, the district court purported to adopt the findings of the PSR on these matters. But the PSR, of course, did not make any findings regarding drug attribution or offense role for

21

the district court to adopt, expressly deferring to the district court for a resolution. Under such circumstances, a district court plainly cannot satisfy its Rule 32(i)(3)(B) obligations simply by reference back to the PSR. And indeed, the government conceded as much at oral argument, agreeing that Young's sentence must be vacated and his case remanded for resentencing. We do just that, vacating Young's sentence and remanding for resolution of the factual disputes raised by Young and for resentencing.[3]

### III.

For the foregoing reasons, we affirm the judgment of the district court as to all of the appellants' convictions and as to the sentence of Travis Paylor. With respect to the sentence of Joseph Young, we vacate the sentence and remand to the district court for resentencing.[4]

Nos. 15-4244, 15-4349, 15-4482, 15-4605 *AFFIRMED;*
No. 15-4400 *AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

---

[3] On appeal, Young separately challenges application of a two-level specific offense characteristic for money laundering under § 2S1.1(b)(2)(B) of the Sentencing Guidelines, and a two-level enhancement for bribery under § 2D1.1(b)(11). We do not address those issues here. The district court's resolution of the factual disputes raised by Young may bear on application of those provisions, and it would be premature to assume that the district court will reach the same judgment with respect to these issues on resentencing.

[4] The government has moved to strike several Rule 28(j) letters filed by the appellants. We have not relied on those letters in reaching our decision today, and the government's motions are denied as moot. We also deny the appellants' motion for leave to file a third supplemental joint appendix. Supplementary appendices are accepted only "under the most extraordinary circumstances," Local Rule 30(c), and the appellants have identified no such circumstances here.