**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-10482

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

JAVIER HERNANDEZ,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cr-20557-BB-1

————————————

Before JORDAN, HULL, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Javier Hernandez appeals his convictions and sentence arising out of a complex and longstanding migrant smuggling conspiracy. Hernandez's main role in the scheme was to deliver stolen boats from Southwest Florida to his co-conspirators in Mexico.

They, in turn, would use these boats to smuggle migrants out of Cuba and into Mexico for ultimate passage into the United States. Sometimes, however, they would sell the vessels for cash to support the migrant smuggling scheme or use the cash or the vessels to bribe local law enforcement officials. On occasion, Hernandez would also transport stolen cars and trucks to Mexico for the use of his co-conspirators. After a twelve-day jury trial, he was convicted on five counts, including conspiracies to smuggle migrants, transport stolen boats and vehicles, and launder money, as well as one substantive offense related to a stolen truck. He received a ninety-five-month sentence.

On appeal, Hernandez primarily challenges the district court's denial of his suppression motion. He maintains that the government collected critical evidence from his cell phone pursuant to an expired warrant. He also claims the evidence at trial was insufficient to support his convictions. Finally, he argues that the district court made several errors in calculating his sentencing guidelines, including miscalculating the loss amount, applying two unsupported enhancements, and failing to grant him a Zero-Point Offender reduction.

We are unpersuaded. The district court correctly denied the suppression motion because the warrant to search his cell phone (which had been issued by a neutral magistrate) had not expired when the government collected the challenged evidence from Hernandez's phone, and, in any event, the FBI agents plainly acted in good faith. Likewise, the evidence presented at trial was sufficient

to sustain each count of conviction beyond a reasonable doubt, and we can discern no reversible error in Hernandez's sentencing. We affirm.

## I.

### A.

At the center of this case is a migrant smuggling ring operating out of the Yucatán Peninsula in Mexico. The conspirators made their money by smuggling numerous migrants out of Cuba over the course of several years and delivering them to the U.S.-Mexico border for entry into the United States. They sent boats to Cuba to collect the migrants, and then surreptitiously transported them to the Yucatán. Once the migrants arrived, the smugglers took them hostage at a compound known as "La Finca." There, they demanded a $10,000 smuggling fee from the migrants' relatives. If the relatives failed to pay, the conspirators physically abused the migrants, sometimes beating them with wooden boards. Some of the female migrants were also placed into strip clubs. If the relatives of a migrant did eventually pay in full, the conspirators took the migrant to the U.S.-Mexico border for passage into the United States. Otherwise, they abandoned the migrant in Mexico.

Hernandez became involved in the conspiracy in late 2017. His job was to help steal boats from Southwest Florida and deliver them to the smugglers in Mexico. Fellow conspirator Ramon Reyes Aranda helped him execute the heists. As Reyes Aranda testified at trial, he first identified a suitable target, typically a vessel

that was at least twenty-eight feet in length with Yamaha engines. Hernandez and Reyes Aranda then had a key fabricated that would start the boat's engine.  They also filled large containers with gasoline to ensure that Hernandez did not need to refuel before he reached Mexico.  And they often checked the boats to ensure that they were not protected by a tracking device or a nearby security camera.  Hernandez and Reyes Aranda cryptically discussed these activities through "WhatsApp," a commonly used messaging service.

After the preparations were completed, Hernandez traveled from Miami Beach to Southwest Florida.  There, under the cover of darkness, Hernandez and Reyes Aranda launched the stolen boat.  Hernandez served as captain and piloted the vessels solo some four-to-five hundred miles across the Gulf to the Yucatán Peninsula.  There, he met the other conspirators, who paid him $10,000 for each boat he delivered.  After obtaining a fraudulent Mexican entry stamp on his passport, Hernandez flew back to Florida with the cash.  Meanwhile, the other conspirators would outfit the boat with a fraudulent hull identification number ("HIN").

The trial evidence established that Hernandez and Reyes Aranda stole more than twenty boats in this manner.  Hernandez further assisted the conspirators by driving stolen cars and trucks from Florida to Mexico.  Another member of the conspiracy, Roberto Marrero Cisneros, created fake vehicle identification numbers ("VINs") for those vehicles, and helped Hernandez obtain temporary license plates.  Once the vehicles were ready for transport,

Hernandez took them to Mexico, where the conspirators used them to bribe law enforcement officials (or simply sold the vehicles for cash). Hernandez received a few thousand dollars for each trip.

While Hernandez did not smuggle the migrants himself, the evidence adduced at trial established that he understood the object of the smuggling scheme and the role he played in facilitating it. During a voluntary interview with FBI agents, Hernandez acknowledged that the boats he sailed from Florida to the Yucatán Peninsula were used in the smuggling operation. He further admitted that he knew Marrero Cisneros was employed by the organization to create fake HINs and VINs for their illegitimate vessels and vehicles. And he also admitted to visiting La Finca, seeing migrants there, and knowing that his co-conspirators were extorting the migrants' families. Another conspirator, Reynaldo Crespo Marquez, testified that the group discussed their smuggling operation openly and in front of Hernandez. In fact, the evidence revealed that Hernandez participated in some of these conversations.[1]

---

[1] A critical portion of Crespo Marquez's trial testimony went this way:

> Q. Did Javier [Hernandez] know about the alien smuggling that your group was doing?
>
> A. Yes.
>
> Q. How do you know that?
>
> A. Because he would see, and he knew about the things we were talking about in front of him. Occasionally, he would pick up money here from the relatives for one of the trips.

6                    Opinion of the Court                    24-10482

Hernandez remained involved in the conspiracy through November 2019.  At that point, Mexican law enforcement officials arrested him for an incident involving marijuana.  They also seized and retained two cell phones and two satellite phones in his possession.  After spending about a month in jail, Hernandez was released, and he returned to the United States.  By his own admission to the FBI, he profited about $200,000 from his role in the conspiracy.

The FBI eventually identified Hernandez as a suspect in the boat thefts.  The agents obtained a warrant from a magistrate judge in the Southern District of Florida for cell-site location information in November 2020, which showed one of Hernandez's phones in the vicinity of the thefts at relevant times.  They also traveled to Mexico, where they retrieved the cell phones from local law enforcement authorities.  Soon thereafter, the government applied for a warrant to search one of Hernandez's cell phones; the application was granted on February 26, 2020 by a magistrate judge in the Southern District of Florida.  The warrant contained an expiration date of March 10, 2020.

The FBI performed the initial extraction of data from the phone on February 27, well in advance of the warrant's expiration

---

Q. Did Javier participate in discussions with you and other members of your group where you talked about the stolen vessels or the stolen vehicles?

A. Yes.

24-10482                Opinion of the Court                7

date.  However, the software the agents were using to extract the relevant data was old, outdated, and unable to copy all the data from Hernandez's WhatsApp account.  As a temporary workaround, the agents manually photographed some of the relevant conversations.  Eventually, the FBI obtained a more advanced version of the software in question, which allowed the agents to perform a second extraction of relevant data and information from Hernandez's cell phone on April 7, 2021.  This extraction successfully copied all the data from Hernandez's WhatsApp account, including older messages the agents previously could not retrieve. The FBI confronted Hernandez with this and other evidence during a voluntary interview on April 18, 2022; he confirmed many of the relevant details we have previously recounted.

Hernandez was initially indicted by a federal grand jury sitting in the Southern District of Florida on November 16, 2022.  The grand jury handed up a superseding indictment on March 23, 2023, charging Hernandez in five counts: (1) conspiracy to encourage aliens to enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I); (2) conspiracy to transport stolen vessels, in violation of 18 U.S.C. § 371; (3) conspiracy to traffic in motor vehicles with altered vehicle identification numbers, in violation of 18 U.S.C. § 371; (4) trafficking in motor vehicles with altered vehicle identification numbers, in violation of 18 U.S.C. § 2321; and (5) money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

**B.**

Before trial, Hernandez moved to suppress the evidence collected from his cell phone.  As relevant here, he argued that the government's second extraction occurred after the warrant's expiration date, making it a warrantless and therefore unlawful search. The district court denied the motion on the merits, and Hernandez proceeded to trial.  During the trial, Hernandez moved for reconsideration of the suppression decision.  The district court denied that motion as well, citing its original ruling and also invoking the good faith exception to the exclusionary rule.

Hernandez was subsequently convicted on all counts after a two-and-a-half-week trial.  Both at the close of the government's evidence and after the jury's verdict, he moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  The district court denied each motion.

At sentencing, the government sought a sixteen-level increase in Hernandez's base offense level under U.S.S.G. § 2B1.1, based on an actual loss amount exceeding $1.5 million.  In support, among other things, it proffered the testimony of Special Agent Sergio Francisco, who was present and prepared to discuss the insurance payouts for four of the stolen vessels.  The government also highlighted the testimony of Crespo Marquez, who stated that one vessel (a Grady-White) had value in excess of $200,000, and it pointed to trial testimony establishing the number of boats that Hernandez stole (twenty-two), as well as their general size and value.  Finally, the government cited trial testimony indicating that

Hernandez transported six or seven stolen vehicles from the United States to Mexico, although it assigned no fair market value to any specific vehicle. The district court accepted this evidence and granted the government's proposed increase.

The court also applied a two-level guidelines enhancement for recklessly creating a substantial risk of death or serious bodily injury pursuant to U.S.S.G. § 2L1.1(b)(6), and a two-level enhancement for using "special skills" (captaining a vessel on the high seas) to accomplish the offense, pursuant to U.S.S.G. § 3B1.3. It did not grant Hernandez's request for a two-level reduction under the "Zero-Point Offender" guideline (U.S.S.G. § 4C1.1).

The district court imposed a ninety-five-month sentence for each of the defendant's convictions for conspiracy to encourage aliens to enter the United States for financial gain, for trafficking in motor vehicles with altered VINs, and money laundering conspiracy. It also imposed a sixty-month sentence for each of Hernandez's convictions for conspiracy to transport stolen vessels and conspiracy to traffic in vehicles with altered VINs, all sentences to run concurrently. Finally, the district court imposed a special assessment of $100 for each count, and a three-year term of supervised release.

This timely appeal followed.

## II.

### A.

We review a district court's denial of a motion to suppress under a mixed standard, reviewing the trial court's factual findings for clear error and its application of the law to those facts *de novo*. *United States v. Grushko*, 50 F.4th 1, 9–10 (11th Cir. 2022). We also review a denial of a Rule 29 motion for a judgment of acquittal *de novo*. *United States v. Hill*, 119 F.4th 862, 865 (11th Cir. 2024). We review the evidence "in the light most favorable to the government and draw all reasonable inferences and make all credibility determinations in support of the jury's verdict." *United States v. Odoni*, 782 F.3d 1226, 1232 (11th Cir. 2015) (quoting *United States v. Thomas*, 987 F.2d 697, 701 (11th Cir. 1993)). In fact, a conviction will be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. O'Steen*, 133 F.4th 1200, 1217 (11th Cir. 2025) (internal quotations omitted).

As for the district court's calculation of the sentencing guidelines, we review any legal interpretation of the guidelines, along with application of the guidelines to the facts, *de novo*. *United States v. Martinez*, 156 F.4th 1185, 1210 (11th Cir. 2025). However, we review the district court's factual findings only for clear error. *Id.*

### B.

Hernandez's suppression claim focuses on the second extraction of data from his cell phone. He acknowledges that the

government could copy data from his phone prior to the warrant's expiration date, and that it could review those copies after the fact. But he maintains that the later extraction of data constituted a warrantless search.

The timing of a search warrant's execution is governed by Federal Rule of Criminal Procedure 41(e)(2). Subparagraph (A) supplies the general rule. It explains that "[t]he warrant must command the officer to . . . execute the warrant within a specified time no longer than 14 days." FED. R. CRIM. P. 41(e)(2)(A). But subparagraph (B) adds an important caveat for warrants authorizing the seizure or copying of electronically stored information. It provides that "[t]he time for executing the warrant in Rule 41(e)(2)(A) . . . refers to the seizure or on-site copying of the media or information, *and not to any later off-site copying or review*." FED. R. CRIM. P. 41(e)(2)(B) (emphasis added).

The plain language of subparagraph (B) forecloses Hernandez's timeliness argument. It explicitly permits "off-site copying" of the electronic information contained in Hernandez's phone after the search warrant's expiration date. "Off-site copying" is essentially what the FBI did when it "extracted" data from Hernandez's phone. As the government's forensic expert explained at trial, an extraction is "a copy of the [phone's] memory module from beginning to end." *Accord Olson v. Cnty. of Grant*, 127 F.4th 1193, 1195 (9th Cir. 2025) (explaining that an extraction is a copy of a phone's

12                    Opinion of the Court                24-10482

contents).  And the copying occurred "off-site," in the FBI's Field
Office in Miami, rather than at the time of an "on-site" seizure.[2]

The Advisory Committee Notes -- to which we "accord[]
great weight in interpreting federal rules" -- reinforce the unambig-
uous language of Rule 41(e)(2)(B).  *Horenkamp v. Van Winkle and Co.,
Inc.*, 402 F.3d 1129, 1132 (11th Cir. 2005) (internal quotations omit-
ted).  They point out that a "substantial amount of time can be in-
volved in the forensic imaging and review of information . . . . due
to the sheer size of the storage capacity of media, difficulties cre-
ated by encryption and booby traps, and the workload of the com-
puter labs."  FED. R. CRIM. P. 41 advisory committee's note to 2009
amendment.  This language recognizes that digital forensics often
cannot be completed within the warrant period.  The massive
amounts of data at issue dwarf the scope of most physical searches.
*See, e.g.*, *Riley v. California*, 573 U.S. 373, 394 (2014) (explaining that
smartphones in 2014 could already hold "millions of pages of text,
thousands of pictures, or hundreds of videos"); *United States v. Cot-
terman*, 709 F.3d 952, 964 (9th Cir. 2013) ("Even a car full of packed
suitcases with sensitive documents cannot hold a candle to the
sheer, and ever-increasing, capacity of digital storage.").  Between
this immense storage capacity and the various technical challenges
associated with extraction -- and they are often substantial -- re-
viewing electronically stored information is often a far more time-

---

[2] Technically, Hernandez's cell phone was never seized "on-site" in this case,
because the FBI had the phone in its possession at the time it obtained the
warrant.

consuming task than searching physical property. In light of this "practical reality," the Committee declined to set a "presumptive national or uniform time period within which any subsequent off-site copying or review . . . would take place." FED. R. CRIM. P. 41 advisory committee's note to 2009 amendment. Otherwise, the government would need to "frequent[ly] petition[] . . . the court for additional time." *Id.*

Notwithstanding the text and the Advisory Committee Notes, Hernandez argues that the "off-site copying" language refers only to "copies-of-a-copy." In other words, it gives the government permission to further reproduce its existing copies, but not to extract more original data from the phone after the warrant's deadline.

This argument has no support in the text of the Rule or the Advisory Committee guidance. There is no reference to "copies-of-a-copy" or anything similar in Rule 41(e)(2)(B); there is only "on-site copying" and "off-site copying." The Advisory Committee Notes likewise say nothing to that effect. To the contrary, the Notes mention the "substantial amount of time [that] can be involved in the forensic imaging and review of information," the "difficulties created by encryption and booby traps," and the "workload of the computer labs." FED. R. CRIM. P. 41 advisory committee's note to 2009 amendment. All of these references contemplate a potentially significant delay between the issuance of a warrant and the successful extraction of a phone's data.

What's more, it is difficult to imagine that the Advisory Committee would write a prescription as mundane as making "copies-of-a-copy" into the Federal Rules of Criminal Procedure. Surely the government did not need a formal grant of permission to Xerox its existing duplicates. Indeed, the government must routinely upload scans of its documents to court servers in the ordinary course of litigation. And it must make digital copies of its evidence to provide defendants with required discovery. The Rules would not likely address so trivial an authority.

Notably, Rule 41(e)(2)(B) also permits "review" of "media or information" after a warrant's expiration date. FED. R. CRIM. P. 41(e)(2)(B). "Review" is a capacious term covering "[c]onsideration, inspection, or reexamination of a subject or thing." *Review*, BLACK'S LAW DICTIONARY (12th ed. 2024). Here, it further suggests that the government may enter and examine the digital device in question after the warrant's nominal expiration date. The reference to "review" bolsters our conclusion that the government could reenter Hernandez's phone to copy data after the warrant officially expired.

Our sister circuits have concurred with our reading of Rule 41(e)(2)(B). The Fourth and Sixth Circuits have each upheld cell phone extractions that postdate Rule 41(e)(2)(A)'s fourteen-day limitation and the expiration date listed in the warrant. In *United States v. Cleveland*, 907 F.3d 423 (6th Cir. 2018), the Sixth Circuit addressed a case in which the Drug Enforcement Agency ("DEA") obtained a warrant to search a cell phone on November 6, 2015, with

an expiration date of November 27, 2015. *Id.* at 429. The DEA shipped the cell phone to one of its laboratories for extraction during the warrant period, but the actual extraction did not occur until December 21, 2015, after the warrant's expiration date. *Id.* The Sixth Circuit nevertheless approved the search. Relying primarily on the plain language of Rule 41(e)(2)(B) and the Advisory Committee guidance, it held that "[the] deadline [in the warrant] does not apply to the time to analyze and investigate the contents of the device off-site." *Id.* at 430–31.

The Sixth Circuit subsequently reaffirmed this holding in *United States v. Whipple*, 92 F.4th 605 (6th Cir. 2024). There, the FBI obtained a warrant to search a cell phone on March 10, 2020, and submitted an internal request for technical assistance in unlocking the phone. *Id.* at 608. However, no one responded until November 13, 2020, and it was not until November 19, 2020 that the FBI obtained the extracted data. *Id.* at 608–09. Despite an eight-month delay, the court upheld the search, repeating that "a warrant's execution date does not apply to off-site investigation and analysis of a cellphone's contents." *Id.* at 614.

Even before *Cleveland* and *Whipple*, the Fourth Circuit addressed the status of late extractions in *United States v. Carrington*, 700 F. App'x 224 (4th Cir. 2017). There, the FBI obtained a search warrant on April 4, 2014, containing an expiration date of April 18, 2014. *Id.* at 231. Due to extraction difficulties, the FBI did not ultimately obtain the data from the phone until October 2014. *Id.* The

Fourth Circuit still approved the extraction, explaining that warrants for electronic information "are deemed executed when the electronically stored information is seized and brought within the government's control, rather than when the information is analyzed by the government." *Id.* at 232. Since the phone was in the government's custody during the warrant period, the warrant was considered properly executed by the expiration date. *Id.*[3]

Hernandez suggests that our unpublished disposition in *United States v. Vedrine*, No. 20-13259, 2022 WL 17259152 (11th Cir. Nov. 29, 2022) (per curiam) warrants a different result. He points to language from that case stating that "once the data is seized and extracted by law enforcement, the warrant is considered executed for purposes of Rule 41, and under Rule 41(e)(2)(B), law enforce-

---

[3] District courts have also routinely approved extractions that postdate a warrant's official expiration date. *See, e.g.*, *United States v. Magana*, No. 18-CR-00068, 2022 WL 4237547, at *2, *4 (E.D. Cal. Sep. 14, 2022) (approving an extraction that postdated the warrant's expiration date by about eleven months); *United States v. Reaves*, No. 20-0443, 2022 WL 717451, at *2 (D. Md. Mar. 10, 2022) (same for an extraction that postdated the warrant's expiration date by about a month); *United States v. Dixon*, No. 20-CR-00003, 2021 WL 2327063, at *4 (N.D. Ga. Apr. 15, 2021), *report and recommendation adopted*, No. 20-CR-3, 2021 WL 1976679 (N.D. Ga. May 18, 2021) (same for an extraction that postdated the warrant's expiration date by about two years); *United States v. Sosa*, 379 F. Supp. 3d 217, 220, 223 (S.D.N.Y. 2019) (same for an extraction that postdated the warrant's expiration date by about two weeks); *United States v. Carpenter*, No. 18-CR-362, 2018 WL 6933160, at *1, *5 (E.D.N.Y. Dec. 28, 2018) (same for two extractions that postdated the warrant's expiration date by about one-to-two months).

ment may analyze that data at a later date." *Id*. at \*6.  The implication, Hernandez argues, is that extraction is covered by the general rule set out in Rule 41(e)(2)(A), and not the exception provided in Rule 41(e)(2)(B).

Hernandez reads too much into *Vedrine*.  In that non-precedential case, the extraction predated the warrant's expiration date. *See id*. at \*5.  The defendant argued only that later forensic examination of the extracted data violated Rule 41.  *See id*.  Accordingly, we had no occasion to address the issue we decide today.  And given the unambiguous language of Rule 41(e)(2)(B) and the Advisory Committee's explicit guidance, we have little trouble concluding that an off-site extraction may postdate a warrant's formal expiration date.

Of course, the language of Rule 41(e)(2)(B) cannot override the Fourth Amendment.  The Fourth Amendment independently commands that search warrants be executed within "a reasonable time."  *United States v. Leick*, 944 F.3d 1017, 1019 (8th Cir. 2019); *see also United States v. Jarman*, 847 F.3d 259, 266 (5th Cir. 2017).  "Reasonableness" is measured in terms of the continued existence of probable cause.  *Leick*, 944 F.3d at 1019 (citing *United States v. Shegog*, 787 F.2d 420, 422 (8th Cir. 1986)).  If law enforcement delays so long in executing a warrant that probable cause becomes stale or dissipates, then the search may violate the Fourth Amendment irrespective of Rule 41(e)(2)(B) or the expiration date of the warrant.  *See United States v. Nicholson*, 24 F.4th 1341, 1351 (11th Cir. 2022) (citing

*United States v. Gerber*, 994 F.2d 1556, 1560 (11th Cir. 1993)).  However, no such Fourth Amendment claim has been raised by Hernandez.

Moreover, there is plenty of reason to believe in this case that the timing of the second extraction was altogether reasonable under the Fourth Amendment.  Nothing about the delay could have conceivably altered the probable cause determination made in February 2020.  Unlike the search of a house, car, or office, the contents of Hernandez's phone were not subject to change over time.  After all, the government had possession of the device and preserved it in its original condition.  Likewise, the basic facts of the crime did not change, because Hernandez's involvement was complete by 2019.

## C.

There was no violation of Rule 41(e)(2)(A) in this case.  But even if there were (and we can discern no basis in the text, Advisory Committee guidance, or otherwise for so ruling), suppression would be unwarranted.  To the extent Hernandez alleges a warrantless search in violation of the Fourth Amendment, arising out of his claimed violation of Rule 41(e)(2)(A), this case presents a classic application of the good faith exception (as the district court held).  And to the extent he asserts a violation of Rule 41(e)(2)(A) alone, he has not demonstrated that the supposed violation prejudiced him or stemmed from intentional disregard for the rule.  *Nicholson*, 24 F.4th at 1351–52.

Exclusion is not the "automatic consequence" of a violation of the Fourth Amendment. *Herring v. United States*, 555 U.S. 135, 137 (2009). That is because "[t]he exclusionary rule is not a personal right." *United States v. Morales*, 987 F.3d 966, 972 (11th Cir. 2021). Instead, it is designed as "a 'prudential doctrine' whose 'sole purpose . . . is to deter future Fourth Amendment violations.'" *Id.* (quoting *Davis v. United States*, 564 U.S. 229, 236–37 (2011)). Consequently, "under the good faith exception to the exclusionary rule, courts decline to suppress evidence when suppression would not further the rule's deterrent purpose." *Id.* at 973 (citing *United States v. Taylor*, 935 F.3d 1279, 1289 (11th Cir. 2019)).

The focus of the good-faith inquiry is on the "objectively ascertainable question [of] whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Herring*, 555 U.S. at 145 (internal quotations omitted) (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)); *see also Taylor*, 935 F.3d at 1290. An officer who acts in objectively reasonable reliance on a statute in performing a search usually does not have reason to know that his actions are illegal. *See Illinois v. Krull*, 480 U.S. 340, 349–50 (1987).

This case is a paradigmatic example of the good faith exception in action. There was no reason for the FBI agents to suspect that they were engaged in an illegal search. Special Agent Aaron Spielvogel testified at length about the phone search at trial. He explained that he flew to Mexico to collect the phone from the

Mexican authorities, and that the FBI did not search it until the government obtained a warrant. The agent moved with great speed to apply for the warrant, and the FBI performed the initial extraction the day after the warrant was signed. It also took manual photos of what its existing software could not extract. The agents considered submitting the phone to the FBI's facility at Quantico for further analysis, but were deterred by the lengthy waiting list for phone review. Eventually, however, the FBI's Miami Field Office obtained more advanced software, and was then able to perform the second extraction. Nothing about this sequence of events would suggest to a reasonable agent that he was violating the Fourth Amendment.[4]

Moreover, when asked about the second extraction at trial, the Special Agent explained his belief that the FBI could conduct an extraction after the warrant expired, so long as it seized the phone and began its initial search beforehand. This understanding of the law aligns closely with the actual language of Rule 41(e)(2)(B), which requires only that "seizure or on-site copying of the media or information" be performed by the warrant's expiration date. FED. R. CRIM. P. 41(e)(2)(B). Indeed, the Special Agent appears to have obeyed a more stringent requirement than what the rule demands. On its face, Rule 41(e)(2)(B) does not require

---

[4] We further note that the delay occurred during the first year of the pandemic, which produced significant staffing shortages across the government. *See Whipple*, 92 F.4th at 614 (accounting for the role of the pandemic in delaying an extraction).

that *any* amount of off-site copying or review occur prior to the warrant's expiration date.

This body of evidence betrays no hint of bad faith. The agents duly obtained a warrant to search Hernandez's phone, and they executed it expeditiously. When they returned to the phone to perform a second extraction, the plain language of Rule 41(e)(2)(B) gave them every reason to proceed. A reasonable, well-trained officer would have seen nothing illegal in this search.

Likewise, we would have no reason to suppress even if the second extraction violated Rule 41(e)(2)(A) alone. "[N]oncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule."[5] *Nicholson*, 24 F.4th at 1351–52 (quoting *Gerber*, 994 F.2d at 1560). Hernandez cannot satisfy either prong of this test.

---

[5] We have indicated on occasion that the classic good faith exception drawn from *Leon* and its progeny also applies to violations of Rule 41. *See United States v. Lehder-Rivas*, 955 F.2d 1510, 1522–23 (11th Cir. 1992) (applying the "reasonably well trained officer" test to a violation of Rule 41); *see also Taylor*, 935 F.3d at 1288, 1291–93 (holding that a search violated both the Fourth Amendment and Rule 41, but applying only the classic good faith exception in declining to suppress the resulting evidence). We need not consider that issue today, however, because *Nicholson* already forecloses any application of the exclusionary rule to the claimed Rule 41 violation.

For starters, given the ample evidence of good faith, Hernandez cannot establish the second prong of the *Nicholson* test. He presented no evidence that the FBI agents had acted with "intentional and deliberate disregard" for Rule 41(e)(2)(A).

As for the first prong, Hernandez has not carried his burden on prejudice. There is no dispute that the second extraction was within the scope of the warrant the FBI obtained in February 2020. Accordingly, even if Rule 41(e)(2)(A) had required a second warrant, the FBI agents could have obtained one from a magistrate judge in the same district using the exact same evidence of probable cause. *See Gerber*, 994 F.2d at 1561 (finding suppression unwarranted for a search inadvertently conducted after the warrant expired when "probable cause [was] apparent and overwhelming"); *United States v. Martinez-Zayas*, 857 F.2d 122, 136–37 (3d Cir. 1988) (explaining that although Rule 41 may have been violated when law enforcement obtained a warrant from a local bail commissioner instead of a federal magistrate, suppression was not required when the warrant was otherwise supported by probable cause and there was "nothing to indicate that but for issuance of the warrant by the bail commissioner the search might not have occurred.").

In fact, probable cause here would have been considerably strengthened by the evidence already obtained through the first extraction. Hernandez makes no argument that the government lacked continuing probable cause to obtain a warrant of identical

scope, even though he bears the burden of proving prejudice.[6] *See United States v. Marx*, 635 F.2d 436, 441 (5th Cir. 1981) (explaining that "[i]n order to show prejudice in this context, *a defendant must show* that because of the violation of Rule 41 he was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed.") (emphasis added).[7]

Thus, even if the second extraction had violated the Fourth Amendment or Rule 41(e)(2)(A) (and it did not), the violation would not warrant suppression.

### III.

Hernandez next maintains that the evidence could not sustain any of his five counts of conviction. We disagree. The evidence was more than sufficient to prove Hernandez's guilt beyond a reasonable doubt as to each charge.

Start with Count One -- it charges a conspiracy to encourage aliens to enter the United States for financial gain, 8 U.S.C

---

[6] Instead, Hernandez offers that the ability of the government to obtain a new warrant should be irrelevant, because it would encourage the government to conduct post-expiration date searches as a matter of course so long as probable cause remained. This claim overlooks the second prong of *Nicholson*, which requires suppression for "intentional and deliberate disregard of a provision in the Rule." *Nicholson*, 24 F.4th at 1352.

[7] Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

§ 1324(a)(1)(A)(v)(I).  To obtain a conviction on this count, the government was required to prove: (1) an agreement between two or more people; (2) whose object was to encourage or induce an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, and residence was or would be in violation of law; and (3) that Hernandez knew of the unlawful purpose of the agreement and joined it willfully. *See United States v. Foreman*, 84 F.4th 615, 622–23 (5th Cir. 2023) (describing the elements of an 8 U.S.C. § 1324(a)(1)(A)(v)(I) conspiracy with a slightly different object); *see also Eleventh Circuit Pattern Jury Instructions* (Criminal Cases) § O96.4 (2025) (listing the same elements in a different order).  Hernandez challenges the last of these elements, arguing that there was insufficient evidence to prove he knowingly joined the smuggling conspiracy.  He maintains that the government did not prove (1) that the boats he stole were used in the migrant smuggling operation; (2) that those boats were sold to finance the migrant smuggling operation; or (3) that he had the requisite mens rea.

We remain unpersuaded.  The evidence was sufficient to allow the jury to find beyond a reasonable doubt that Hernandez knowingly joined the smuggling conspiracy alleged in Count One and that the boats were used to further the object of the conspiracy.  He admitted to Special Agent Spielvogel that he knew his partners were smuggling migrants, and he acknowledged having been to La Finca, having seen the migrants, and knowing that their relatives were subject to extortionate phone calls.  And, perhaps even more

significantly, the Special Agent testified that in the interview, Hernandez conceded that the boats he transported were used to move migrants, and that the vehicles he drove helped bribe Mexican law enforcement authorities to ignore the group's activities. Additionally, co-conspirator Crespo Marquez testified that the stolen boats and vehicles were sometimes used as bribes for law enforcement officials, that the other conspirators discussed the smuggling conspiracy in front of Hernandez, and that even Hernandez sometimes collected smuggling fees extorted from the migrants' Florida-based relatives. On top of that, one of the migrants was able to identify Hernandez from a photo array.

From these facts, a rational jury could infer Hernandez's knowing participation in the smuggling conspiracy and that the vessels and vehicles he had stolen played an important role in accomplishing the object of the conspiracy. *See, e.g.*, *United States v. Iriele*, 977 F.3d 1155, 1171–72 (11th Cir. 2020) (explaining that the government may show the defendant joined a conspiracy through circumstantial evidence of acts furthering that conspiracy).

As for Count Two -- conspiracy to transport stolen vessels, 18 U.S.C. § 371 -- the evidence against Hernandez was substantial. A conviction under Section 371 requires proof of three elements: "[1] an agreement among two or more persons to achieve an unlawful objective; [2] knowing and voluntary participation in the agreement; and [3] the commission of an overt act by a conspirator in furtherance of the agreement." *United States v. Collins*, 854 F.3d 1324, 1328 (11th Cir. 2017). In this case, the "unlawful objective"

was a violation of 18 U.S.C. § 2312, which makes it a federal crime to knowingly transport a stolen vessel in interstate or foreign commerce. Hernandez again disputes the sufficiency of the government's proof as to the mental state element of the crime, arguing that the government failed to introduce "lawful, competent, and substantial proof showing" that he "stole any boats or knowingly transported them."

Again, we are unpersuaded. Reyes Aranda, Hernandez's co-conspirator, testified point blank that Hernandez knew the first boat the pair took was stolen, and repeatedly acknowledged stealing vessels *with* Hernandez. He further explained that he and Hernandez took some twenty-two boats under the cover of darkness and Hernandez had keys fabricated to start the engines of twenty-one of them. Reyes Aranda further recounted that Hernandez obtained extra fuel containers for the boats. Cell site location information and WhatsApp messages between Hernandez and Reyes Aranda amply corroborated his testimony. The jury was free to credit, as it did, the co-conspirator's testimony.

The trial testimony of other co-conspirators also reinforced Reyes Aranda's statements. Marrero Cisneros testified that Hernandez told him the boats were stolen. And a third co-conspirator, Crespo Marquez, recounted that Hernandez blamed delays in procuring new vessels on security cameras and occupied homes, further indicating that Hernandez understood the nature of the thefts.

Finally, Special Agent Spielvogel testified that Hernandez acknowledged that the vessels he transported were not legitimately

purchased. In response to one question, the Special Agent said Hernandez had "admit[ted] to piloting these stolen boats from Naples to Mexico." Elsewhere, he recounted that Hernandez claimed that he took the boats with their owners' knowledge as part of an insurance fraud scheme. Hernandez also admitted to the Special Agent that he knew the conspirators employed Marrero Cisneros to create fake hull identification numbers for vessels.

This collection of evidence more than adequately established that Hernandez knowingly and voluntarily agreed to steal and assist others in the theft and transportation of the vessels, and he took a variety of overt acts in support of the conspiracy. Nothing more was necessary to sustain his conviction on Count Two.

Counts Three and Four charged Hernandez with conspiracy to traffic in motor vehicles with altered VIN numbers, and the substantive crime of trafficking in a motor vehicle with an altered VIN number, respectively (18 U.S.C. §§ 371, 2321). While we have not previously explicated the elements of the substantive offense, the relevant statute is straightforward. It requires (1) that the defendant "buy[], receive[], possess[], or obtain[] control of" a "motor vehicle or motor vehicle part"; (2) "with intent to sell or otherwise dispose of" that "motor vehicle or motor vehicle part"; and (3) that the defendant "know[s] that an identification number for such motor vehicle or part has been removed, obliterated, tampered with, or altered." 18 U.S.C. § 2321(a). The elements of the conspiracy charge are once again: "[1] an agreement among two or more persons to achieve an unlawful objective; [2] knowing and voluntary

participation in the agreement; and [3] the commission of an overt act by a conspirator in furtherance of the agreement," where the "unlawful objective" is the substantive offense just described. *Collins*, 854 F.3d at 1328.

Hernandez's defense to both charges is the same: he says that the government failed to prove his knowledge that the VINs were altered. He maintains that Marrero Cisneros was the only witness who testified to the altered VINs from personal knowledge, and that Marrero Cisneros's testimony does not prove his own knowledge.

The evidence on these counts was largely circumstantial, but it was sufficient to convict Hernandez. According to Special Agent Spielvogel's testimony, Hernandez admitted to knowing that one of the conspirators, Marrero Cisneros, forged identification numbers for the organization. And Marrero Cisneros testified that he specifically doctored the VIN on a Toyota truck that Hernandez drove to Mexico, that he would sometimes deliver fake documents to Hernandez, and that he helped Hernandez obtain temporary license plates for the Toyota truck. Hernandez also exchanged cryptic messages about the doctored VIN with two of his co-conspirators and performed an internet search for the location of a VIN on a Toyota Tundra. Additionally, Crespo Marquez testified that the smuggling organization received stolen vehicles, that Hernandez was the only person who brought them to Mexico, and that he did so six or seven times.

Count Five charged Hernandez with a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). To prove that offense, the government had to demonstrate "(1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." *United States v. Feldman*, 936 F.3d 1288, 1307 (11th Cir. 2019) (internal quotations omitted). Here, the government specified that the "money-laundering offense" of element (1) was a violation of 18 U.S.C. § 1956(a)(2)(A), which makes it a crime to:

> [T]ransport[], transmit[], or transfer[], or attempt[] to transport, transmit, or transfer a monetary instrument or funds . . . to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity.

The "specified unlawful activities" in this case included the transportation of stolen vessels.

Hernandez challenges his participation in this conspiracy, arguing that there is no evidence to show that he conducted financial transactions for the purpose of bringing about the boat thefts. This claim fails for two reasons. First, because the charge in question is conspiracy, rather than a substantive offense, the government had no obligation to specifically prove that Hernandez himself carried out any financial transactions for the purpose of furthering the conspiracy. It simply had to show that he knowingly and voluntarily participated in an agreement to carry out those transactions.

Second, in any event, there was significant evidence that Hernandez knowingly joined and participated in the charged conspiracy. The trial revealed that Hernandez frequently moved money between Mexico and the United States as part of the boat theft scheme. Crespo Marquez explained that Hernandez was paid for his services in Mexico and flew back to the United States with that money. Likewise, Reyes Aranda testified that Hernandez would sometimes ferry cash from Mexico to the United States to pay Reyes Aranda for his work. More pertinently, Reyes Aranda further testified that one of the Mexico-based conspirators sent money directly to Hernandez to finance aspects of the boat heists. It is difficult to imagine a more direct way to violate Section 1956(a)(2)(A). This body of evidence is more than sufficient to support Hernandez's conviction on Count Five beyond a reasonable doubt.

## IV.

Finally, Hernandez brings four challenges to his sentence. Specifically, he argues that the district court miscalculated the loss amount under U.S.S.G. § 2B1.1, incorrectly imposed guidelines enhancements under U.S.S.G. §§ 2L1.1(b)(6) and 3B1.3, and improperly denied him a "Zero-Point Offender" guidelines reduction under U.S.S.G. § 4C1.1.

These arguments are without merit. For one thing, we see no error in the district court's loss calculation. Under U.S.S.G. § 2B1.1(b) -- which determines enhancements based on loss amount for offenses involving stolen property -- a loss amount

greater than $1.5 million (but not more than $3.5 million) warrants a sixteen-level increase from the base offense level. The evidence before the district court comfortably supported a loss amount within this range. The trial testimony itself contained competent proof that Hernandez and his co-conspirators stole and transported twenty-two large, high-value boats, from brands like Grady-White, Yellowfin, Jupiter, and Boston Whaler. According to co-conspirator Crespo Marquez, the first stolen boat alone was worth more than $200,000 in the United States. Likewise, the government proffered evidence from insurance records that four other specific stolen boats were individually valued at $120,000 (the "Luca Brasi"), $130,000 (the "Ultimaytum"), $305,000 (the "Mellow Yellow"), and $325,000 (the "Reel Estate"). This brought the total value of these five stolen vessels to $1.08 million. The government further argued that the remaining stolen boats, given their description, could conservatively be valued at $100,000 each, yielding an additional total sum of $1.5 million.[8] This brought the reasonably estimated aggregate value of all of the stolen vessels to more than $2.5 million. The government's estimate of the remaining boats' value was well-supported by the trial testimony of Reyes Aranda and Crespo Marquez.

Moreover, although the government mainly relied on the vessel-related evidence to establish the amount of the actual loss, it

---

[8] The government rounded down the number of stolen vessels from twenty-two to twenty, notwithstanding Reyes Aranda's testimony that the total was twenty-two.

also pointed to testimony that Hernandez had transported to Mexico as many as seven high-end vehicles with forged titles. Those included a Camaro, a Toyota truck, a Cadillac Escalade, a Chevrolet vehicle, two Infiniti QX80s, and a Ford vehicle. It did not attempt to estimate the specific value for any vehicle, but argued that, collectively, they increased the total loss amount from the $2.58 million for the boats alone to a total of about $2.75-3 million for all the stolen property. We can safely assume that the vehicles had some fair market value (after all, the testimony indicated that the vehicles were used as bribes or sold for cash). Plainly, they added to the already-sufficient calculus of total loss from the stolen vessels.

Hernandez argues, nevertheless, that his attorney disputed the government's proffer of the insurance values for the four specific stolen vessels, and so the district court could not consider it. We disagree. Defense counsel accepted that an FBI Special Agent was present and was prepared to testify consistently with the insurance records. Counsel simply argued that this testimony would not accurately describe the value of the boats. But he offered no evidence or arguments that would have disputed the proffered testimony, nor did he ask to cross-examine the agent in question. Under these circumstances -- when the defendant submits nothing to contest the proffer and does not seek to cross-examine the available witness -- the district court may consider the proffer in making the loss calculation. *See United States v. Emanuel*, 869 F.2d 795, 796 (4th Cir. 1989) (per curiam) (holding that the district court was not obligated to reject a proffer when the defendant contested it but offered no reason to doubt its accuracy).

In the aggregate, there was sufficient evidence to allow the district court to find that the thefts of the vessels and vehicles resulted in an actual loss exceeding $1.5 million.

Likewise, the district court did not reversibly err in applying the Section 2L1.1(b)(6) enhancement. That section of the guidelines provides for a two-level increase if the offense "involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." U.S.S.G. § 2L1.1(b)(6). In imposing the Section 2L1.1(b)(6) enhancement, the district court concluded that Hernandez knew about the threats to the migrants and the threats associated with the smuggling venture, and thus the substantial risk of death or serious bodily injury was foreseeable to him.

We see no clear error in the district court's factual findings. The record amply shows that the migrants were subject to extortionate threats and could be badly beaten if their relatives did not pay up. According to Special Agent Spielvogel's testimony, certain female migrants were even required to work in strip clubs to pay off their debt. He further testified that Hernandez was aware of how the smuggling venture operated. Indeed, Hernandez himself admitted to visiting La Finca and seeing the migrants there. Finally, two migrants testified during trial that during the lengthy journey from Cuba to Mexico, they were crammed into relatively small

boats, and that they were seated on the boat floor without life jackets. On this evidential foundation, the district court could reasonably apply the Section 2L1.1(b)(6) enhancement.[9]

The district court also correctly applied the "Special Skills" enhancement at sentencing. Under U.S.S.G § 3B1.3, "[i]f the defendant . . . used a special skill . . . in a manner that significantly facilitated the commission or concealment of the offense," then the

---

[9] Although no issue has been raised by Hernandez in this case, we think it prudent to observe that, for sentencing purposes, under U.S.S.G. § 1B1.3(a)(1)(B), a defendant may only be held responsible for the actions of others if those actions were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." As a result, before a district court may hold a defendant liable for the actions of others, it "must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." *United States v. Barry*, 163 F.4th 1346, 1350 (11th Cir. 2026) (internal quotations omitted); U.S.S.G. § 1B1.3, cmt. (n. 3(B)). Here, the district court skipped this step; it did not make individualized findings that the co-conspirators' actions fell within the scope of the criminal activity.

But on this record, we have no difficulty concluding that the scope of the activities Hernandez agreed to included the extortionate threats to migrants and the dangerous boat trips. Hernandez admitted to Special Agent Spielvogel (1) that he knew his co-conspirators were smuggling migrants, (2) that the vessels he transported were used in this smuggling operation, and (3) that the smugglers had made extortionate phone calls to the migrants' relatives. Crespo Marquez also testified that Hernandez was aware of the smuggling business, and that he would even collect payments from the migrants' relatives in the United States. In short, the evidence amply established that the conduct of the other conspirators was within the scope, and in furtherance of the jointly undertaken criminal activity, and was reasonably foreseeable.

district court should apply a two-level guidelines increase. We have repeatedly held that "captaining a vessel on the high seas is the type of activity that requires skills not possessed by members of the general public and, therefore, requires 'special skills' within the meaning of section 3B1.3." *United States v. Calderon*, 127 F.3d 1314, 1339 (11th Cir. 1997). Thus, for example, in *United States v. De La Cruz Suarez*, 601 F.3d 1202 (11th Cir. 2010), we affirmed a special skills enhancement applied to two defendants who had piloted boats to Cuba and around the Florida Keys at night. *Id.* at 1211, 1219.

Our case is altogether consonant with this precedent. Several witnesses testified at trial about the dangers and difficulties surrounding piloting a boat from the coast of Southwest Florida across four-to-five hundred miles of the Gulf to the Yucatán Peninsula in Mexico. According to a testifying Coast Guard officer, the water can be choppy and rough in places, and the weather can change rapidly; it takes a "well-trained mariner" to navigate this journey. Hernandez himself described the Gulf currents as "really bad," and also mentioned sudden changes in the weather. He further opined that the several-hundred-mile journey was "very treacherous," and explained that it was "not an easy ride," because "the currents can deviate you if you're not paying close attention." Between this testimony and our well-established precedent, we can discern no error in the district court's application of the special skills enhancement to Hernandez's conduct.

Finally, we have no occasion to remand for an application of the Zero-Point Offender reduction. Pursuant to U.S.S.G. § 4C1.1,

a defendant is eligible for a two-point guidelines reduction if he has zero criminal history points and meets a variety of other criteria. Hernandez's sole argument for reversal on this point is that the district court erred in applying the U.S.S.G. § 2L1.1(b)(6) enhancement, and that this error infected the Zero-Point Offender determination. Having already concluded that the district court did not err in applying the Section 2L1.1(b)(6) enhancement, necessarily we can discern no error in not applying the Zero-Point Offender reduction.

**AFFIRMED.**